IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| Deborah Clark, | C/A. No. 3:15-cv-2864-CMC-PJG |
| Plaintiff | |
| v. | |
| School District Five of Lexington and Richland Counties, | **Opinion and Order** |
| Defendant. | |

  Through this action, Plaintiff Deborah Clark ("Plaintiff") seeks recovery from her former employer, School District Five of Lexington and Richland Counties ("District"), claiming her employer failed to provide a reasonable accommodation for her disability in violation of the Americans with Disabilities Act (42 U.S.C. §§12101, *et seq*.) ("ADA"). ECF. No. 1. Specifically, Plaintiff argues her dog, Pearl, should be allowed to accompany her to work as a service dog for her Post-Traumatic Stress Disorder and Panic Disorder with Agoraphobia. She also claims violation of public policy and breach of contract due to the District's failure to accommodate her disability. *Id.* The matter is before the court on Defendant's Motion for Summary Judgment, filed June 20, 2016. ECF No. 29. Plaintiff filed her response in opposition on July 19, 2016. ECF No. 37. Defendant filed a reply on July 29, 2016. ECF No. 38.

  In accordance with 28 U.S.C. § 636(b) and Local Civil Rule 73.02 (B)(2)(g), D.S.C., this matter was referred to United States Magistrate Judge Paige J. Gossett for pre-trial proceedings and a Report and Recommendation ("Report"). On January 6, 2017, the Magistrate Judge issued a Report recommending Defendant's motion for summary judgment be granted as to the ADA claim, and the court decline to exercise supplemental jurisdiction over the state law claims. ECF

No. 42.  The Magistrate Judge advised the parties of the procedures and requirements for filing objections to the Report and the serious consequences if they failed to do so.  Plaintiff was granted an extension of time to file objections to the Report (ECF No. 44), and filed her objections on January 26, 2017.  ECF No. 45.  Defendant also received an extension to file a reply (ECF No. 49) and did so on February 23, 2017.  ECF No. 51.  This matter is now ripe for resolution.

After conducting a *de novo* review as to the objections made, and considering the record, the applicable law, and the Report and Recommendation of the Magistrate Judge, the court declines to adopt the Report.  For the reasons below, the court denies Defendant's motion for summary judgment on the ADA and breach of contract claims, but grants summary judgment on the violation of public policy claim.

## I.     **Standard**

The Magistrate Judge makes only a recommendation to this court.  The recommendation has no presumptive weight, and the responsibility to make a final determination remains with the court. *Mathews v. Weber*, 423 U.S. 261 (1976).  The court is charged with making a *de novo* determination of those portions of the Report to which specific objection is made, and the court may accept, reject, or modify, in whole or in part, the recommendation of the Magistrate Judge, or recommit the matter to the Magistrate Judge with instructions.  28 U.S.C. § 636(b)(1).  The court reviews only for clear error in the absence of an objection.  *See Diamond v. Colonial Life & Accident Ins. Co.*, 416 F.3d 310, 315 (4th Cir. 2005) (stating "in the absence of a timely filed objection, a district court need not conduct a *de novo* review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'") (quoting Fed. R. Civ. P. 72 advisory committee's note).

2

Summary Judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). On a motion for summary judgment, the district court must "view the evidence in the light most favorable to the nonmoving party." *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568 (4th Cir. 2015) (citing *Tolan v. Cotton*, 134 S.Ct. 1861, 1868 (2014) (per curiam)). "Summary Judgment cannot be granted merely because the court believes that the movant will prevail if the action is tried on the merits." *Id.* Therefore, the court cannot weigh the evidence or make credibility determinations. *Id.* at 569. The district court may not "credit[] the evidence of the party seeking summary judgment and fail[] properly to acknowledge key evidence offered by the party opposing that motion." *Id.* at 570. However, a party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985). Therefore, "[m]ere unsupported speculation . . . is not enough to defeat a summary judgment motion." *Ennis v. National Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 62 (4th Cir. 1995).

## II.   Facts

The following facts are presented in the light most favorable to Plaintiff, the party opposing summary judgment.

### Plaintiff's Disability

In 1989, Plaintiff lived on Johns Island, South Carolina when Hurricane Hugo hit the Charleston area. Plaintiff was trapped with her husband and son in a closet during the hurricane, which did major damage to her home. After this experience, Plaintiff developed anxiety, panic attacks, and agoraphobia, and believed she had Post-Traumatic Stress Disorder ("PTSD"). Plaintiff Dep. 34:23 – 35:5; 36:20 – 37:16. As she has grown older, Plaintiff's PTSD has

3

worsened. *Id.* at 38:6-11. In 2010 through 2013, Plaintiff began discussing her history and symptoms with her son's psychiatrist, Dr. Darlene Moak. In 2013, Plaintiff became a patient of Dr. Moak, who opined in a June 14, 2013 letter Plaintiff "fully meets criteria for both PTSD and panic disorder with agoraphobia." ECF No. 37-19 at 9, Moak letter.

### Teaching at Alternative Academy

Plaintiff began employment with the District in the 2008-2009 school year, as a special needs teacher at the Alternative Academy ("Academy") in Chapin, South Carolina. The Academy had in place the Healing Species Program, a pet therapy program for children with special needs. Plaintiff participated in this program, utilizing animals in the classroom to assist the children. ECF No. 37 at 6.

In 2011, Plaintiff adopted a Chihuahua puppy named Pearl. Plaintiff became interested in training Pearl as a therapy dog for use with children at school in the Healing Species Program, and as a service dog for her anxiety and PTSD. Plaintiff Dep. at 32:11-13. Before the 2011-2012 school year began, Plaintiff and a colleague, Sharon Gray, approached their new principal, Don Hardie, about bringing their dogs to school as part of the Healing Species Program. *Id.* at 32:1-33:2. Plaintiff also decided "around that time" to train Pearl as a service dog for her PTSD. *Id.* at 34:7-9. Pearl accompanied Plaintiff to school for the 2011-2012 and 2012-2013 school years as a therapy dog for the students. While at the school, Pearl wore a vest that identified her as a therapy dog, earning a service dog patch when she completed the requirements for a service dog. *Id.* at 71:24-72:3. There is no evidence any student, parent, or District employee complained about Pearl's presence in the classroom. *Id.* at 154:1-5; ECF No. 37-23, Hefner Dep. 19:17-19.

The Academy was to be moved to a new location to begin the 2013-2014 school year. In the spring of 2013, Mr. Hardie announced in a faculty meeting that no dogs would be allowed in

the new location on the Spring Hill High School campus.  Plaintiff Dep. 118:2-9.  Mr. Hardie

provided the rationale as including perception ("seeing teachers out walking a dog," "Spring Hill

High School parent's (sic) perception of the dog, concerns with that piece"), environment changes

(schedule; being in an enclosed, bigger school; better manicured grass; dog excrement), and

fairness to Spring Hill High School teachers.  ECF No. 29-3, Hardie Dep. 18:3-14; 60:11-61:17.

After this announcement, Plaintiff notified Mr. Hardie she needed Pearl with her at school as a

service dog.  Hardie Dep. 58:4-9

**Pearl's Functions as Plaintiff's Service Dog**

Plaintiff and her co-worker, Ms. Gray, trained Pearl, in accordance with Delta Society

standards[1], to respond to Plaintiff's symptoms of anxiety and developing panic attacks.[2]  Pearl was

taught to stand her ground, create a barrier between Plaintiff and others, and put pressure on

Plaintiff's chest or lick her hand.  ECF No. 29-2, Plaintiff Dep. 64:13-68:12; 70:13-71:4.

As Plaintiff's service dog, Pearl assists during her panic attacks and anxiety.  Pearl provides

"deep pressure" to Plaintiff's chest, and acts as a physical buffer between Plaintiff and other

people, especially in tight spaces.  *Id.* at 65:17-68:12.  Pearl is also able to "interrupt the process"

of Plaintiff's panic attacks, and "gives [Plaintiff] something else to focus on."  *Id.* at 68:1-12.

---

[1] See ECF No. 29-2, Plaintiff Dep. Ex. 3, International Association of Assistance Dog Partners Minimum Training Standards for Public Access (service dog requirements cited by Plaintiff as similar to the ones she used, as the "Delta Society doesn't exist anymore.").

[2] Plaintiff's veterinarian "checked off the list from Delta Society that [Pearl] was able to do everything that's on the service dog list."  Plaintiff Dep. 71:25-72:3.

5

**Formal Request for Accommodation**

In June 2013, Plaintiff contacted Dr. Angela Bain, Chief Human Resources Officer for the District, to request "the reasonable accommodation of bringing my service dog, Pearl, to work with me during the 2013-2014 school year." ECF No. 37-4, Clark letter 6/12/13. Dr. Moak wrote a letter on June 14, 2013, opining Plaintiff had PTSD and panic attacks and that "forcing Ms. Clark to teach without the assistance of her service dog will be profoundly detrimental to her well being." ECF No. 37-19 at 9, Moak letter 6/14/13. On July 18, Dr. Bain responded, requesting a meeting with Plaintiff and noting additional information was needed "to confirm a disability under the ADA and, if one exists, the functional limitations of that disability as it relates to your job performance and the need and effectiveness of your requested accommodation." ECF No. 37-5, Bain letter 7/18/13.[3] Dr. Bain's letter noted the District's position that Pearl did not meet the definition of a "service animal" as defined in Title II of the ADA, but was an "emotional support or comfort dog," which was excluded from the ADA's definition of a service animal. *Id.*

The meeting between Plaintiff and Dr. Bain appears to have occurred on August 5, 2013. On August 6, 2013, Plaintiff wrote Dr. Bain to request a temporary accommodation of bringing Pearl to school "while the additional information you requested in our meeting yesterday is being received and processed." ECF No. 37-6, Clark letter 8/6/13. Plaintiff explained there were no students in the school at that time, and she felt it necessary for Pearl to accompany her so she could "set up her classroom and become accustomed to the new environment." *Id.* Dr. Moak also sent another letter on August 6, 2013, providing additional information about the tasks Pearl is trained

---

[3] The letter also stated "[i]f we are unable to obtain sufficient documentation to substantiate that you have an ADA disability and need a reasonable accommodation, the District may require you to see an appropriate health professional of the District's choice." *Id.*

to do related to Plaintiff's PTSD: to provide deep pressure during a panic attack, to "quietly hold [her] place for up to five minutes," to "stand and stay or sit and stay and brace [herself] in that position," and "to hold [her] ground, preventing people from making body contact with Mrs. Clark" and reducing panic, enabling Plaintiff "to cope better with the risk of close contact in the work place." ECF No. 37-19, Moak letter 8/6/13.

This request was apparently denied, and Plaintiff had a panic attack at school the afternoon before students reported for their first day. This attack was brought on because furniture for her classroom had not been delivered and none of her computers were operating. Mr. Hardie arrived and found Plaintiff on the floor of her classroom, crying and asking for Pearl. Plaintiff Dep. 85:10-86:10.

Dr. Bain responded to Plaintiff's request by letter on August 22, 2013, acknowledging the District's receipt of Dr. Moak's August 2013 letter. ECF No. 29-4 at 20, Bain letter 8/22/13. Dr. Bain, however, denied Plaintiff's request, stating the District did not believe Pearl qualified as a "service animal" under Title II of the ADA, and further did not consider Pearl to be a reasonable accommodation under the ADA, because Plaintiff was "going to be in a school with students who may be allergic to and/or afraid of dogs." *Id.* The letter suggested other proposed accommodations, such as wearing a weighted vest or Plaintiff "being allowed to remove [herself] from an environment upon the onset of a panic attack (with notice to the administration so that arrangements for supervision of [her] students can be made)." *Id.* The letter also reminded Plaintiff her

> essential job responsibilities include interaction with and supervision of students, which can result in a 'risk of close contact.' Please be advised that if you believe that your Panic Disorder with Agoraphobia will require you to avoid interacting with students, you may not be otherwise qualified for your position as a teacher.

7

*Id.*

### Grievance Process

Rather than submitting a request for an alternative accommodation, Plaintiff initiated the grievance process by writing Mr. Hardie on September 3, 2013 and renewing her request to bring Pearl to school.  ECF No. 37-7, Clark letter 9/3/13.  She noted "last year I was allowed this ADA accommodation. . . . Your denial of my request for this accommodation places me in jeopardy." *Id.*  Mr. Hardie denied Plaintiff's request by letter of September 10, 2013, noting "[w]e are still concerned at this point of having a dog on campus" because students "may be allergic to and/or afraid of dogs," and therefore "the District does not believe that your request is reasonable."  ECF No. 37-8, Hardie letter 9/10/13.

Plaintiff appealed her grievance to Dr. Bain on September 23, 2013.  Dr. Bain, Plaintiff, and Winnie Brown (Coordinator for Certified Personnel) met on October 1, 2013, for a level two, step one grievance hearing.  In this meeting, Plaintiff stated she was unwilling to try the proposed alternative accommodation, a weighted vest.  ECF No. 29-2, Plaintiff Dep. 135:7-13; ECF No. 29-4, Bain Dep. 73:22-75:10.  Dr. Bain expressed concern with student distraction and felt this would be lessened with the vest.  Bain Dep. 75:3-10.  Dr. Bain denied the grievance in a memorandum on October 4, 2013.  ECF No. 29-4 at 17.  In her memorandum, Dr. Bain noted no ADA accommodation had been previously granted.  She explained the new school has a "larger population of students [and therefore] more risk of students being distracted and afraid of the dog, and there are more students who would be allergic to a dog."[4]  *Id.*  Dr. Bain also suggested alternative accommodations, such as a deep pressure vest or other weighted clothing, and Plaintiff

---

[4] Dr. Bain no longer challenged Pearl's use as a service dog versus a comfort dog.

8

could "prearrange with administration that you remove yourself from an environment upon the onset of a panic attack provided you secure supervision of your students." *Id.*

Plaintiff then appealed to Dr. Stephen Hefner, Superintendent, on October 23, 2013.  In response, Plaintiff, Dr. Bain, and Mark Bounds (acting superintendent) met on November 6, 2013.  Mr. Bounds also denied Plaintiff's request in a memorandum on November 20, 2013.  ECF No. 37-9.  In that memorandum, Mr. Bounds noted although Plaintiff stated she was allowed the ADA accommodation the prior year, neither the school nor district received an ADA request for accommodation that year.  He explained Plaintiff was allowed to bring the dog under the Healing Species Program at first, and in her social studies class "because the Academy for Success was at an isolated location."  He further noted Plaintiff was not willing to consider other options for accommodation, but was able to "successfully perform[] all of your duties and responsibilities without your dog.  You have demonstrated the ability to accommodate for your condition(s) successfully without your pet." *Id.*  In denying Plaintiff's grievance and affirming the decisions from lower levels of grievance process, he stated "we are happy to work with you to try other reasonable accommodations which might assist you." *Id.*

On December 2, 2013, Plaintiff requested an opportunity to appear before the Board of Trustees concerning her grievance.  Board Policy GBK –Staff Concerns, Complaints/Grievances provides the Board has discretion to allow a grievant to appear before the Board or to uphold the Administration's decision based on documentation.  *See* ECF No. 29-5 at 8.

On December 16, 2013, the District's attorney, Andrea White, wrote Plaintiff's attorney Allen Nickles, explaining "the District is interested in reaching an amicable resolution in reference to Ms. Clark's request that she be permitted to bring her dog to school with her as an accommodation for what Ms. Clark asserts is a disability covered by the Americans with

9

Disabilities Act."   Ms. White informed Mr. Nickles of the District's suggested alternative accommodation, the weighted vest, that was declined by Plaintiff.  Because Plaintiff previously stated she did not have the financial means to pay to visit her doctor to discuss alternative accommodations, Ms. White noted "the District is willing to select a psychologist and pay for the cost of an independent evaluation of Ms. Clark, for the purpose of determining the specific ways in which Ms. Clark's PTSD impacts her in the workplace and whether her dog is the only reasonable accommodation to deal with that impact." *Id.*  The letter provided if the psychologist opined having a therapy/service dog at work is the only reasonable workplace accommodation for Ms. Clark, the District would request information indicating Pearl is trained to provide that accommodation.   If Plaintiff could show Pearl is so trained, "the District will allow the accommodation as necessary for Ms. Clark to be able to function at work."  *Id.*[5]

The record does not reveal that the suggested independent evaluation took place.  However, Plaintiff's psychiatrist, Dr. Moak, thereafter wrote a letter opining the suggested accommodation of a weighted vest would "not provide the responsiveness to changes in psychological and emotional states that a service dog can."  ECF No. 29-5 at 13, Moak letter 1/17/14.  Dr. Moak continued to "strongly" recommend Plaintiff be allowed to have Pearl at work.  Dr. Moak outlined how not having Pearl negatively affected Plaintiff, and concluded "I believe that not allowing Mrs.

_____

[5] Although there is no evidence of a written District policy concerning the presence of dogs, Plaintiff cites instances in which a dog was allowed on various District campuses.  ECF No. 37 at 11.  A student was allowed a service dog at Dutch Fork High School for several years (ECF No. 37-24, Metts Dep. at 12:23-13), dogs came to the Spring Hill High campus for a vocational grooming and veterinary program (ECF No. 37-25, Slatton Dep. at 9:1-10:18), service dogs were allowed at a fair to highlight services available to students with disabilities (*Id.* at 11:7-12:14) and at an author presentation about disabilities and the use of service dogs (ECF No. 37-21, Bounds Dep. at 55:25-56:8).

Clark to have her service dog is negatively impacting her well-being as well as creating unnecessary risk to her and her students." *Id.*

In advance of the Board's decision, Ms. White again wrote Mr. Nickles, requesting further information regarding Plaintiff's disability and requested accommodation. ECF No. 29-4 at 13, White letter 2/14/14. The following information was requested: an explanation of how Plaintiff's PTSD affected her in the workplace and limited her ability to function as a teacher; why Plaintiff was unwilling to try the alternative accommodations suggested by the District; Pearl's vaccination records; list of tasks Plaintiff is unable to do at work without Pearl; how Plaintiff signals Pearl she needs assistance; and how Plaintiff maintains control of Pearl. *Id.*

On February 21, 2014, Plaintiff responded to Ms. White's letter. ECF No. 37-13, Clark letter 2/21/14. She noted her PTSD affected her and limited her ability to function as a teacher because the District refused to allow Pearl to accompany her to work, "causing [her] a great deal of stress and anxiety resulting in an unwanted weight loss which impairs [her] health." She included the January 17, 2014 letter from Dr. Moak regarding the alternative accommodation of a weighted vest and why she was not willing to try it. Plaintiff noted she "is able to perform [her] duties;" however, without the assistance of Pearl she is in "extreme jeopardy" when monitoring students released *en masse* (fire drills, emergency evacuations, inclement weather), attending meetings at other schools during student dismissal time, and attending district meetings, in-service days, or occasions when large crowds are expected."[6] *Id.* She provided Pearl's vaccination record and discussed how she signals and maintains control of Pearl. *Id.*

---

[6] Mr. Hardie and Dr. Bain accommodated Plaintiff's difficulty regarding fire drills, inclement weather, District-wide meetings and other occasions during which large groups of people would

In a memorandum to the Board on March 20, 2014, Dr. Hefner explained the history of Plaintiff's request and grievance and provided documentation to assist the Board in its decision. He noted "[t]he unanimous decision to deny Ms. Clark's grievance is supported by the underlying circumstances and is legally warranted."  ECF No. 29-5 at 6.  At its meeting on March 24, 2014, the Board unanimously voted not to hear Plaintiff on her grievance, and upheld the recommendation of the administration.  ECF No. 29-5 at 3, Gantt Dep. at 43:17-24; ECF No. 29-5 at 9, meeting notes.

**Panic Attacks at School**

Throughout the grievance process in the 2013-2014 school year, Plaintiff continued to teach at the Academy.  She was released from supervisory responsibilities in large group settings, and permitted to stand outside large group or District-wide meetings.  ECF No. 29-4 at 7, Bain Dep. 76:16-77:4.  However, she continued to have panic attacks at school.  ECF No. 29-2, Plaintiff Dep. at 87:8-91:18.  The first, the day before students arrived, is detailed above.  Plaintiff also had a panic attack on a rainy day when the Academy students had to walk through Spring Hill High School rather than outside, thus causing a large number of students to congregate in the foyer. Plaintiff's coworker, Ms. Gray, saw Plaintiff was "pale, trembling, and hyperventilating." ECF No. 37-18 at ¶ 8, Gray Aff.  Ms. Gray assisted Plaintiff back to her classroom and stayed with her, realizing "[i]t was clear to me that Ms. Clark was not capable of dealing with students at that time." *Id.*  She also had panic attacks during fire drills.  ECF No. 29-2, Plaintiff Dep. at 92:6-93:9. Plaintiff lost weight due to her anxiety at school without Pearl.  Her panic attacks continued during

---

gather.  Plaintiff was allowed to stand in the back or in the hall for District meetings, to leave last or stay behind the group when large groups of students gathered, and was excused from lunchroom duty after she notified Mr. Hardie that it posed difficulties for her.

the 2014-2015 school year. *Id.* at 93:10-97:2. Her final panic attack at school was in the last week of the 2014-2015 school year. *Id.* at 71:13-17.

### Plaintiff's Retirement

Plaintiff retired from teaching after the 2014-2015 school year. Although she had planned to teach the seven more years remaining on her national board certification, she retired because of the panic attacks that continued without her requested accommodation. ECF No. 29-2, Plaintiff Dep. 101:18-105:2. Although she is sure she told Mr. Hardie the reason for her retirement, she did not mention this reason for retirement in her resignation letter. *Id.* at 104:10-105:2. Further, she did not send anything else in writing to Mr. Hardie regarding the reasons for her retirement, although she "is sure he understood" it was because she could not have Pearl at school with her. *Id.* at 101:7-24; 102:10-24.

## III.   ADA Standard

In order to establish a prima facie case for failure to accommodate under the ADA, Plaintiff must show "(1) that she was an individual who had a disability within the meaning of the statute; (2) that the employer had notice of her disability; (3) that with reasonable accommodation she could perform the essential functions of her position; and (4) that the employer refused to make such accommodations."[7] *Jacobs*, 780 F.3d at 579. In this case, the District does not contest that Plaintiff is an individual with a disability within the meaning of the statute or that it had notice of her disability. Therefore, the determination of whether Plaintiff's failure to accommodate claim can survive summary judgment rests on prongs (3) and (4): whether with reasonable

---

[7] Plaintiff's claim arises under Title I of the ADA, which governs employment discrimination cases. Titles II and III of the ADA address access by service animals to government and public accommodations.

13

accommodation Plaintiff could perform the essential functions of her job, and whether the District refused to make such accommodation.

    a.  <u>Reasonable Accommodation</u>

To overcome a motion for summary judgment, a plaintiff must "present evidence from which a jury may infer that the proposed accommodation is reasonable on its face, i.e., ordinarily or in the run of cases." *Reyazuddin v. Montgomery County, Maryland*, 789 F.3d 407, 414 (4th Cir. 2015). "A reasonable accommodation is one that is feasible or plausible." *Id.* Generally, whether a proposed accommodation is reasonable is a question of fact. *Id.* at 416 (citing *Pandazides v. Va. Bd. of Educ.*, 13 F.3d 823, 833 (4th Cir. 1994).

    *i.  Essential Functions; Equal Benefits and Privileges*

The term "reasonable accommodation" is defined in the implementing regulations of the ADA as (in part):

> (ii) Modifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable an individual with a disability who is qualified to perform the essential functions of that position; or
> (iii) Modifications or adjustments that enable a covered entity's employee with a disability to enjoy equal benefits and privileges of employment as are enjoyed by its other similarly situated employees without disabilities.

16 C.F.R. § 1630.2(o)(1)(ii), (iii). A modification or adjustment that enables an individual to perform the essential functions of the job is one category of reasonable accommodation; the regulation also acknowledges a separate category – a modification or adjustment that enables an employee with a disability to enjoy equal benefits and privileges of employment.

A plaintiff may be entitled to an accommodation if it enables him or her to perform the essential functions of the position.

14

> To determine essential job functions, Title I requires that consideration "be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job."

*Reyazuddin*, 789 F.3d at 414–15 (citing 42 U.S.C. § 12111(8)).  "Other relevant evidence can include 'the employer's judgment as to which functions are essential,' 'the amount of time spent on the job performing the function,' 'the consequences of not requiring the incumbent to perform the function,' and the work experience of people who hold the same or similar job."  *Jacobs*, 780 F.3d at 579 (citing 29 C.F.R. § 1630.2(n)(3)).

A plaintiff may also be entitled to a reasonable accommodation if it enables him or her to enjoy "equal benefits and privileges" of employment. § 1630.2 (o) (iii).  For example, in *Gleed v. AT&T Mobile Services, LLC*, the Sixth Circuit held an employer may not deny an accommodation that allows the employee to perform his job "without great pain and a heightened risk of infection" merely because the employee is "physically capable" of doing his job without the accommodation.  *Gleed*, 613 F. App'x 535, 539 (6th Cir. 2015) (unpublished).  The Fifth Circuit has similarly held reasonable accommodations are not restricted to enabling performance of the essential functions of an employee's job, but also to enabling enjoyment of equal benefits and privileges of employment.  *Feist v. La. Dept. of Justice, Office of the Atty. Gen.*, 730 F.3d 450, 453 (5th Cir. 2013); *see also Nawrot v. CPC Intern.*, 259 F.Supp.2d 716, 726 (N.D. Ill. 2003) (denying summary judgment and noting the ADA was created to prohibit placing disabled persons in the position "to choose between working while risking physical harm and death, or unemployment."); *Merrill v. McCarthy*, 184 F.Supp.3d 221, 238 (E.D.N.C. 2016) ("If the employee needs reasonable accommodation to enable her 'to enjoy equal benefits and privileges of employment,' the employer is obligated to provide it as well.");  *Kessler v. AT&T*, No. 3:13-cv-207, 2015 WL 5598866, at *11

15

(M.D. Pa. Sept. 22, 2015) (denying summary judgment even though Plaintiff stated "I was always able to do my job, it's just I would be able to do my job better with accommodations," and declining to adopt Defendant's argument Plaintiff must be "totally incapable of achieving the completion of some job related task before she may be entitled to a reasonable accommodation.").

ii.  *Interactive Process*

The "reasonable accommodation" definition also sets forth a negotiation process for an employer and employee engaged in finding a reasonable accommodation:

> To determine the appropriate reasonable accommodation it may be necessary for the covered entity to initiate an informal, interactive process with the individual with a disability in need of the accommodation. This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations.

16 C.F.R. § 1630.2(o)(3). This requirement is "implicit in the fourth element" of a plaintiff's prima facie case for failure to accommodate. *Haneke v. Mid-Atlantic Capital Mgmt.*, 131 F. App'x 399, 400 (4th Cir. 2005) (unpublished).

"The ADA imposes upon employers a good faith duty to engage with their employee in an interactive process to identify a reasonable accommodation." *Jacobs*, 780 F.3d at 581. The Fourth Circuit has quoted the Seventh Circuit, which held regarding the interactive process:

> No hard and fast rule will suffice, because neither party should be able to cause a breakdown in the process for the purpose of either avoiding or inflicting liability. Rather, courts should look for signs of failure to participate in good faith or failure by one of the parties to make reasonable efforts to help the other party determine what specific accommodations are necessary. A party that obstructs or delays the interactive process is not acting in good faith. A party that fails to communicate, by way of initiation or response, may also be acting in bad faith. In essence, courts should attempt to isolate the cause of the breakdown and then assign responsibility.

*Crabill v. Charlotte Mecklenburg Bd. of Educ.*, 423 F. App'x 314, 323 (4th Cir. 2011) (unpublished) (quoting *Beck v. Univ. of Wis. Bd. of Regents*, 75 F.3d 1130, 1135-36 (7th Cir. 1996)

16

and reversing grant of summary judgment to School Board where reasonable jury could conclude the Board failed to offer counselor accommodation to transfer to different school).  Therefore, both the individual seeking an accommodation and the employer have a duty to engage in good faith in the interactive process.

The interactive process "is not an end in itself; rather it is a means for determining what reasonable accommodations are available to allow a disabled individual to perform the essential job functions of the position sought."  *Wilson v. Dollar Gen. Corp.*, 717 F.2d 337, 347 (4th Cir. 2013). "Liability for failure to engage in an interactive process depends on a finding that, had a good faith interactive process occurred, the parties could have found a reasonable accommodation that would enable the disabled person to perform the job's essential functions."  *Id.*  An employee must demonstrate that the employer's "failure to engage in the interactive process resulted in the failure to identify an appropriate accommodation for the disabled employee."  *Crabill*, 423 F. App'x at 323.

The First, Fifth, and Seventh Circuits have held an employer cannot be liable under the ADA if the employee breaks down the interactive process.  "If an employer engages in the interactive process with the employee in good faith, for the purpose of discussing alternative reasonable accommodations, but the employee fails to cooperate in the process, then the employer cannot be held liable under the ADA for failure to provide reasonable accommodations."  *E.E.O.C. v. Kohl's Dept. Stores, Inc.*, 774 F.3d 127, 132 (1st Cir. 2014); see also *Jackson v. City of Chicago*, 414 F.3d 806, 814 (7th Cir. 2005) (affirming District Court's grant of summary judgment for defendant when plaintiff was responsible for the breakdown in the interactive process and agreeing "she could not claim that the City failed to accommodate her."); *Loulseged v. Akzo Nobel, Inc.*, 178 F.3d at 731, 740 (5th Cir. 1999) ("In light of these undisputed facts, no reasonable jury could

find that responsibility for the failure of the process to reasonably accommodate [plaintiff] rested with anyone but herself. Accordingly, the district court was correct to grant judgment as a matter of law in favor of [defendant].”); *Beck,* 75 F.3d at 1135, 1137 (“But where, as here, the employer does not obstruct the process, but instead makes reasonable efforts both to communicate with the employee and provide accommodations based on the information it possessed, ADA liability simply does not follow"). An Eastern District of North Carolina case cited the above cases in granting summary judgment for the defendant when it “repeatedly attempted to engage in this interactive process with [plaintiff], but [plaintiff] repeatedly and egregiously thwarted an accommodation process.” *Allen v. City of Raleigh*, 140 F. Supp. 3d 470, 489 (E.D.N.C. 2015).

### iii.  *Alternative Reasonable Accommodation*

The ADA does not require an employer to provide the very accommodation requested by the employee. “An employer may reasonably accommodate an employee without providing the exact accommodation that the employee requested. Rather, the employer may provide an alternative reasonable accommodation. *Reyazuddin*, 789 F.3d at 415–16 (citing *Hankins v. The Gap, Inc.,* 84 F.3d 797, 800 (6th Cir.1996) (“[T]he employer providing the accommodation has the ultimate discretion to choose between effective accommodations, and may choose the less expensive accommodation or the accommodation that is easier for it to provide.”)). “Nonetheless, a reasonable accommodation should provide a meaningful employment opportunity. Meaningful equal employment opportunity means an opportunity to attain the same level of performance as is available to nondisabled employees having similar skills and abilities.” *Id.* at 416.

## IV.    Parties' Arguments

    a.  *Defendant's Motion for Summary Judgment*

In support of its motion for summary judgment on Plaintiff's ADA failure to accommodate claim, the District argues Plaintiff does not require Pearl in order to perform the essential functions of her job and therefore, the presence of Pearl is not a reasonable accommodation for her panic attacks.  ECF No. 29-1 at 16.  The District further argues it offered Plaintiff a reasonable alternative accommodation, but she refused to try it and therefore failed to engage in the interactive process required by the ADA.

The District argues Plaintiff is able to perform the essential functions of her job without accommodation, pointing to Plaintiff's February 21, 2014 letter stating "I am able to perform my duties."  The District also cites Dr. Moak's letters explaining that not having Pearl at work would be "detrimental to [Plaintiff's] well being," but not expressing an opinion on whether Pearl was necessary to enable Plaintiff to perform the essential functions of her job.  Further, the District notes Mr. Hardie's testimony that Plaintiff continued to do a good job teaching even when her request for Pearl was denied.  In sum, the District argues Plaintiff does not need Pearl to perform her "essential functions," those in the classroom, but only to perform "marginal functions" of her job as a teacher ("fire drills, mass meetings or movements of the student body or faculty, and District-wide gatherings and rallies of hundreds of District employees.").  ECF No. 29-1 at 19.  Therefore, the District argues, Pearl is not a reasonable accommodation because her presence does not enable Plaintiff to perform the essential functions of her job.

In addition, the District argues Plaintiff was responsible for the breakdown of the interactive process mandated by the ADA when she refused to try an alternative reasonable accommodation suggested by the District – a weighted vest.  *Id.* at 22.  The District maintains it is

not required by the ADA to provide the specific accommodation requested by the employee, so long as the accommodation provided is a reasonable one.  Towards that end, the District argues it engaged in an interactive process with Plaintiff, who refused to try the weighted vest suggested by the District.  Therefore, the District contends Plaintiff "obstructed the interactive process and caused it to break down." *Id.* at 24.  As a result, the District argues Plaintiff is unable "to maintain this action against the District for discrimination." *Id.*

### b.  Plaintiff's Response in Opposition

In her response in opposition to the District's summary judgment motion, Plaintiff advances three primary arguments: 1) Plaintiff need not "suffer . . . to maintain employment" even if she is able to perform the essential teaching functions of her job; 2) the District refused to make reasonable accommodation to Plaintiff; and 3) the alternative accommodations offered by the District were not sufficient and not medically supported.  ECF No. 37.

First, Plaintiff argues she was entitled to an accommodation, regardless of whether she was physically able to perform the essential functions of her job.  Plaintiff asserts two questions should be submitted to a jury: "First, does relief from **some** circumstances likely to cause a panic attack provide an effective accommodation? Second, must Ms. Clark suffer from the symptoms of her disability unnecessarily to maintain employment?" ECF No. 37 at 13 (emphasis in original). Plaintiff further contends a jury should decide whether the "limited actions taken by the District [to remove certain tasks from her responsibility] constitute an effective or reasonable accommodation." *Id.*

Second, Plaintiff argues the District had an obligation to engage in an interactive process to determine a reasonable accommodation, but Plaintiff "was compelled to file a grievance to obtain any 'interaction.'" *Id.* at 14.  Plaintiff contends the School Board affirmed the denial of her

20

grievance without a hearing and failed to seek medical information regarding the utility of the proposed alternative accommodation, even though Plaintiff provided information and opinions from her treating psychiatrist in support of her position regarding Pearl and the weighted vest.

Finally, Plaintiff notes the conflicting testimony regarding the District's suggestion that Plaintiff visit an independent psychologist for an evaluation.  Although Dr. Bain testified Plaintiff's failure to visit an independent psychologist was "part of the decision" to deny her request, the District Superintendent testified the "failure to get a second opinion" was not a reason Pearl was not allowed to accompany Plaintiff to school.

Plaintiff submits that she has presented evidence, through her own deposition testimony and letters, and letters from Dr. Moak, that working without Pearl caused health problems including continued panic attacks, anxiety, and weight loss.  Plaintiff argues this entitled her to a reasonable accommodation, which the District failed to provide.

### c.  Report, Objections, and Responses

In the Report, the Magistrate Judge found Plaintiff able to perform the essential functions of her job without accommodation, and that the District was not required to provide any accommodation.  ECF No. 42.  The Report noted Plaintiff had not identified any benefit or privilege she could not enjoy without accommodation.  *Id.* at 10.  Further, the Report found insufficient evidence from which a reasonable jury could find Plaintiff had a panic attack in a classroom setting or the accommodations offered by the District did not end the panic attacks.  *Id.* The Report therefore recommended the court grant summary judgment for the District on Plaintiff's ADA claim.

Plaintiff's objections to the Report argue the Magistrate Judge erred in weighing the evidence, failing to consider 29 C.F.R. § 1630.2(o)(iii) regarding equal benefits and privileges of

21

employment, failing to balance the requested accommodation against any undue hardship to the District, and narrowly defining the "essential functions" of Plaintiff's job as classroom functions. ECF No. 45.  Plaintiff argues she "merely seeks to enjoy equal benefits and privileges of employment" and a jury should decide whether the District's removal of the "ancillary functions" from her responsibilities was "reasonable and sufficient in view of known dangers that cannot be predicted and are inherent in supervising students in a school setting." *Id.* at 6-7.  Further, Plaintiff contends the crowds of students that would gather outside her classroom during inclement weather caused heightened anxiety and panic, and she was forced to leave her class with other staff on occasion because she could not predict when her panic attacks would occur.  *Id.* at 10-11. Therefore, Plaintiff argues that issues of fact remain and summary judgment is inappropriate.

The District replied, agreeing with the Magistrate Judge's recommendation.  ECF No. 51. It continued to argue Plaintiff did not need any accommodation to enable her to perform the essential functions of her job or to receive equal benefits or privileges of employment, as Plaintiff's supervisor testified she was a very good teacher and suggested she was a valued employee even without Pearl.  *Id.* at 3-4.  The District again argued Plaintiff failed to engage in the interactive process due to the rejection of the weighted vest and her failure to see an independent psychologist, even when the District advised it would allow a service dog if the independent psychologist opined it was the only reasonable accommodation.  The District asserts this rejection by Plaintiff "is sufficient to defeat as a matter of law her failure to accommodate claim."  *Id.* at 11.

As the court has performed a *de novo* review of the record and declines to adopt the Report, the objections will be addressed generally below.

22

## V.  ADA Discussion

### a. Essential Functions

While the District argues Plaintiff was able to perform the essential functions of her job without accommodation, citing Plaintiff's own letter dated February 21, 2014, Plaintiff argues she was unable to do her job without suffering anxiety, panic, and weight loss.[8]  The District contends the essential functions were classroom duties as described in the position description. ECF No. 29-6 at 2-3 ¶¶ 5-7 (Bain affidavit); at 6-7 (position description for "Alternative Education Teacher"). Plaintiff argues this presents an "unrealistically narrowed description of a teaching position by ignoring exposure to students outside the classroom setting." ECF No. 45 at 10.

Plaintiff's letter of February 21, 2014, stated, in response to the District's query regarding tasks she was unable to do without her dog:

> I am able to perform my duties; however, without the assistance of my dog, the following situations place me in extreme jeopardy: monitoring students at times when they are released en mass (sic) rather than in an orderly manner such as fire drills, emergency evacuations, or when students are released to the front foyer for lunch during inclement weather; attending meetings at other schools which are held at student dismissal time; attending district meetings or in-service training days, or other occasions when large crowds are expected.

---

[8] The court notes Plaintiff may also prevail if a reasonable accommodation would allow her to enjoy "equal benefits and privileges" of employment as are enjoyed by other similarly situated employees without disabilities.  *See* 16 C.F.R. § 1630.2 (o) (iii); *Merrill*, 184 F.Supp.3d at 238 ("[D]efendant argues that it is not required to provide plaintiff reasonable accommodation because she can perform her essential job duties without any accommodation. The court concludes that defendant perceives its obligations too narrowly. To be sure, an employer has a duty to provide reasonable accommodations that enable a disabled employee to perform essential job functions. But, that is not the employer's only duty. If the employee needs reasonable accommodation to enable her 'to enjoy equal benefits and privileges of employment,' the employer is obligated to provide it as well.").

ECF No. 29-4 at 11. Plaintiff thereafter was excused from monitoring large crowds of students in the cafeteria, allowed to keep her distance and remain behind groups of students released during inclement weather and drills, and released from the requirement of attending District-wide meetings or allowed to stand in the back or outside the meeting room, as long as she obtained the information. ECF No. 29-4 at 7, Bain Dep. 76:16-77:4. However, in response to Ms. White's letter, Plaintiff advised her PTSD limited her "ability to function as a teacher." ECF No. 29-4 (Plaintiff letter 2/21/14). Plaintiff thereafter continued to experience anxiety, weight loss, and panic attacks, even after the "ancillary" job functions described in her letter were removed.[9] ECF No. 29-2, Plaintiff Dep. 71:13-17 (last panic attack was during the last week of the 2014-2015 school year); 77:17-78:1 ("I was having so many panic attacks at school that I just really didn't think I could make it."). Therefore, a question of fact remains as to whether Plaintiff was able to perform the essential functions of her job, without accommodation.

  b. *Reasonable Accommodation*

  Because there is a question of fact regarding whether Plaintiff needed some accommodation to perform the essential functions of her job, the court must also consider whether her requested accommodation – a service dog – was the only reasonable accommodation. Whether

---

[9] Plaintiff also continued to perform duties outside the classroom – including parking lot and cafeteria duty. Plaintiff had two panic attacks while on lunchroom duty, and requested that Mr. Hardie and Mr. McGinty (assistant principal) remove her from that duty, which they did after about a month. Plaintiff Dep. 93:15- 97:7; 98:8-11. She was assigned to perform other duties (such as standing at the front door in the morning and directing the children around to the back, or letting bus riders out in the afternoon), and there is no evidence these responsibilities were removed.

an accommodation is reasonable is a generally a question of fact for the jury. *Reyazuddin*, 789

F.3d at 416 (citing *Pandazides v. Va. Bd. of Educ.*, 13 F.3d 823, 833 (4th Cir. 1994).

Plaintiff requested an accommodation of bringing Pearl with her to school. In response,

the District offered several often inconsistent reasons for not allowing Pearl on the Spring Hill

High School campus.[10] The District also suggested an accommodation of a weighted vest to

provide "deep pressure" to Plaintiff, which she cited as one of Pearl's abilities to quell her panic

attacks.[11] Her psychiatrist provided an opinion the weighted vest would not suffice to calm

---

[10] Plaintiff was originally told by Mr. Hardie that no dogs were allowed on the new campus due to perception, changes in the school environment, and fairness to Spring Hill High teachers. ECF No. 29-3 18:3-14; 60:11-61:17. In denying Plaintiff's ADA accommodation request, Dr. Bain stated the District did not believe Pearl met the definition of a "service dog," and believed there may be students in the larger school setting who were allergic to or afraid of dogs. ECF No. 29-4. Mr. Hardie also denied Plaintiff's step one grievance, noting the District was still concerned because students may be allergic to and/or afraid of dogs. ECF No. 37-8. In denying Plaintiff's step two grievance, Dr. Bain noted the new school had a larger population of students and more risk of students being distracted and afraid of the dog, and more students who would be allergic. ECF No. 29-4 at 17. Dr. Bain also testified in her deposition she was afraid the dog would become a "distraction." Bain Dep. 75:3-10. The acting Superintendent, Mr. Bounds, denied the next step in the grievance process, noting while Pearl provided a comfort to Plaintiff, "this does not meet the requirements to be a service animal." Further, he "did not see any evidence that your dog was individually trained to perform specific tasks which would ameliorate your psychiatric conditions." ECF No. 37-9. Finally, in a position statement to the EEOC, the District noted Pearl is not properly trained, Plaintiff is not certified to train service dogs, and Pearl is not a service dog as defined by the ADA. ECF No. 37-1, EEOC letter.

[11] The Appendix to the C.F.R. notes:
> It may also be a reasonable accommodation to permit an individual with a disability the opportunity to provide and utilize equipment, aids or services that an employer is not required to provide as a reasonable accommodation. For example, it would be a reasonable accommodation for an employer to permit an individual who is blind to use a guide dog at work, even though the employer would not be required to provide a guide dog for the employee.

29 C.F.R. § Pt. 1630, App. In this case, Plaintiff was not requesting the District provide a service dog for her; she already had one trained to respond to her panic attacks in ways she found diminished her symptoms.

Plaintiff during a panic attack, and having Pearl with Plaintiff would "accommodate Mrs. Clark's disability." ECF No. 37-19 at 5. The District then removed some "ancillary" job duties from Plaintiff's responsibilities during the grievance process. Plaintiff, however, testified she continued to suffer anxiety, weight loss and panic attacks, and was unable to carry out all assigned functions. Plaintiff Dep. 71:13-17 (last panic attack was during the last week of the 2014-2015 school year); 83:10-24 (Plaintiff called in sick rather than attend large group meeting in the 2014-2015 school year); 95:3-8; 97:2-3 (Plaintiff unable to perform lunchroom duty).

In support of her position Pearl is a reasonable accommodation, Plaintiff argues she provided her psychiatrist's opinion recommending Pearl be permitted to accompany her to school in order to reduce anxiety, panic, and weight loss. In addition, Plaintiff had prior experience with Pearl in the classroom, during which time she suffered no panic attacks and there were no reported problems caused by Pearl. The District came forward with various reasons why Pearl was not a reasonable accommodation, including changes in the school environment, students with fear of or allergies to dogs, student distraction, and Pearl's purported lack of training as a service dog. Ultimately, however, the District agreed to allow a trained service dog if a psychologist opined this was the "only reasonable workplace accommodation for Plaintiff." Therefore, the court finds there is a genuine issue of material fact as to whether Pearl is the only reasonable accommodation for Plaintiff's disability or whether the accommodations offered by the District were reasonable.

    *c. Interactive Process*

The District asserts Plaintiff failed to engage in the "interactive process" required to determine appropriate accommodations. The District argues it is not mandated by the ADA to provide the very accommodation Plaintiff requested, but has "ultimate discretion to choose between effective accommodations." *Reyazuddin*, 789 F.3d at 416. Because Plaintiff refused to

26

try the weighted vest, the District argues, the parties were unable to determine whether the vest was a "reasonable accommodation."

The District also claims Plaintiff refused to see an independent psychologist, even though the District had noted if the psychologist opined the presence of the dog was the only reasonable accommodation, it would allow the dog (provided it was trained).  ECF No. 51 at 10 (citing ECF No. 29-4 at 15, White letter 12/16/13).  However, Ms. White's letter of December 2013 offered the suggestion of an independent psychological evaluation in response to Plaintiff's assertion that she could not afford to see her psychiatrist to discuss alternative accommodations.  After receiving the letter, Plaintiff provided Dr. Moak's letter opining the weighted vest would not be sufficient and her "strong recommendation" Pearl be allowed to accompany Plaintiff to work.  There is no evidence the District then renewed its request that Plaintiff see an independent medical provider.  It is possible Plaintiff considered the request moot, as she had provided the information the District was seeking.  Further, testimony is inconsistent whether the District considered any lack of participation in an independent psychological examination a reason to deny Plaintiff's grievance for failure to participate in the interactive process.  ECF No. 37-23, Hefner Dep. 24:24-25:2 ("Q: So is it your position that Ms. Clark's failure to get a second opinion is a reason why Pearl was not allowed to come to school?  A: No."); ECF No. 37-20, Bain Dep. 35:11-16 (Q: My question to you is, was the failure of Ms. Clark to obtain a medical opinion other than Dr. Moak a basis for the decision to deny her request for an accommodation? A: It was part of the decision.").  Therefore, the court is unable to determine on this record whether and why the interactive process broke down.

In sum, the court finds genuine issues of material fact as to the following: 1) whether Plaintiff was able to perform the essential functions of her job without accommodation; 2) whether

Plaintiff was able to enjoy equal benefits and privileges of employment without accommodation; 3) whether Plaintiff obstructed the interactive process and caused it to break down; 4) whether the District failed to act in good faith to engage with Plaintiff in the interactive process to identify a reasonable accommodation; and 5) whether Plaintiff's requested accommodation was the only reasonable accommodation.  Because genuine issues of material fact exist, summary judgment is not warranted on the ADA failure to accommodate claim.

## VI.    **State Law Claims**

The Report recommended the court decline to exercise supplemental jurisdiction over Plaintiff's state law claims because it recommended summary judgment on the ADA claim. However, because the court does not grant summary judgment on the ADA claim, the state law claims must be addressed.

### a.  *Violation of Public Policy*

Plaintiff asserts a cause of action for "violation of public policy," arguing the District breached its own policies when it failed to accommodate Plaintiff's disability.  Compl. ¶¶ 26-29. To the extent Plaintiff is asserting a claim for wrongful termination in violation of public policy, such a claim is not available because a statutory remedy exists.  *See Barron v. Labor Finders of South Carolina*, 713 S.E.2d 634, 637 (S.C. 2011) (holding a claim for wrongful termination in violation of public policy is not available where the employee has an existing statutory remedy). Further, Plaintiff was not terminated; instead, she retired.

To the extent Plaintiff alleges a free-standing claim for violation of public policy due to the District's alleged failure to follow their own nondiscrimination policies, such a claim does not exist as an independent cause of action.  Plaintiff argues "the State's express policy, that the practice of discrimination against individuals on the basis of disability is unlawful and in conflict

28

with the ideals of South Carolina," is codified at S.C. Code Ann. § 1-13-20.  ECF No. 37 at 19.

The court does not dispute this "declaration of policy;" however, it is within the South Carolina

Code, which provides an administrative remedy for discrimination via the State Human Affairs

Commission.  Plaintiff did not raise such a claim under the South Carolina Human Affairs Law.

Finally, the court finds this claim duplicative of Plaintiff's breach of contract claim, in

which Plaintiff asserts the District's policies "were an integral part of the contractual employment

relationship between Ms. Clark and the District."  Compl. ¶ 32.  As discussed below, this claim is

properly brought under a breach of contract theory and need not be duplicated as a violation of

public policy.  Summary judgment is appropriate, and this claim is dismissed.

*b. Breach of Contract*

Plaintiff also alleges a cause of action for breach of contract, as her employment contracts

incorporate Board policies regarding discrimination.  *Id.*  District Policy GCF states "[t]he District

will make reasonable accommodations for an individual who is otherwise qualified for a position

unless the accommodation would impose an undue hardship on district operations as determined

by the district."  ECF No. 37-16, Policy GCF.

Defendant argues this claim fails because Plaintiff "is unable to establish that the District

violated the ADA in denying her permission to bring her dog to her job."  ECF No. 29-1 at 26.  As

the court has denied summary judgment on Plaintiff's ADA claim, summary judgment is denied

on this claim.

## VII.    Conclusion

Having conducted a *de novo* review of the Report and underlying motion and related

memoranda, and having fully considered Plaintiff's objections, the court declines to adopt the

Report.  For the above reasons, Defendant's motion for summary judgment is denied as to

Plaintiff's ADA and breach of contract claims.  The motion for summary judgment is granted as to Plaintiff's claim for violation of public policy, and that claim is dismissed with prejudice.  This case shall be set for jury selection on June 15, 2017.  A scheduling order with appropriate pre-trial deadlines shall issue.

**IT IS SO ORDERED**.

s/ Cameron McGowan Currie
CAMERON MCGOWAN CURRIE
Senior United States District Judge

Columbia, South Carolina
March 29, 2017

30